**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELMER CRUZ, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>ATTYX, LLC (formerly known as SUNCO CAPITAL, LLC, and also doing business as SUNCO SOLAR, SUNCO ROOFING AND SOLAR, ATTYX SOLAR LLC, ATTYX ROOFING, NEW YORK ROOFING, AND LGCY POWER), ATTYX NEW YORK LLC, GRANT YOUNG, BENSON PAYNE, SOLAR MOSAIC LLC, SOLAR SERVICING LLC, WEBBANK and SERVICE FINANCE COMPANY, LLC,<br><br>  Defendants. | Civil Action No.:<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Elmer Cruz ("Plaintiff"), on behalf of himself and all others similarly situated, on personal knowledge as to the facts concerning himself, on information and belief as to all other matters, and based on the investigation of counsel and public statements, brings this class action against Defendants Attyx, LLC (formerly known as SUNco Capital, LLC), Attyx New York LLC (collectively with Attyx, LLC, "Attyx"), Grant Young, Benson Payne, individually and as principals of the aforementioned entities, Solar Mosaic LLC ("Mosaic"), Solar Servicing LLC ("Solar Servicing"), WebBank and Service Finance Company, LLC ("Service Finance") (collectively "Defendants"), and alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      Elmer Cruz is a 65-year-old homeowner who resides in Rockaway, New York. Within months of retirement, Mr. Cruz fell victim to a coordinated and elaborate fraud perpetrated by Defendants Attyx, Young, Payne, Mosaic, WebBank, and Service Finance. Specifically, through said Defendants' fraudulent scheme, Defendants fraudulently saddled Mr.

Cruz with over $100,000 of debt for a defective residential solar power system ("Solar System") on terms Mr. Cruz never agreed to.

2.      Two representatives of Attyx came to Mr. Cruz's home promising a deal on solar panels.  They represented to Mr. Cruz that he would get a new Solar System for only $28,520 out-of-pocket and would pay only $167 a month to Attyx for the system.  The Attyx representatives promised Mr. Cruz that the Solar System would significantly reduce or eliminate his utility bills.  In addition, the Attyx representatives stated to Mr. Cruz that Attyx would provide him with a completely free roof replacement as an incentive for Mr. Cruz installing the Solar System.  Mr. Cruz did not sign anything but orally agreed to the terms as described by the salesmen (set forth above).  However, all of the representations made by ATTYX were false, it was a bait and switch.

3.      Instead of providing Mr. Cruz with a $28,520 Solar System on the terms described and a free roof replacement, Attyx in fact charged Mr. Cruz $100,300, fraudulently committed Mr. Cruz to two separate loans through Defendants Mosaic and Service Finance, both with costly monthly payments (and interest) which far exceeded the promised $167 per month, and then left him with a defective Solar System (which both underperformed promised performance and was defectively installed).  Plaintiff never agreed to take out a third-party loan with either Mosaic or Service Finance.  Regarding the Solar System, Plaintiff understood from Attyx's representations that he would pay $167 per month to Attyx (based on a $28,520 system), not a third-party lender (i.e. Mosaic).  More than that, Attyx saddled Plaintiff with a loan of $50,300 with Mosaic, almost double the represented cost of the Solar System.  Plaintiff never agreed to those terms.  Instead, Attyx forged Plaintiff's signature on an electronically generated sales agreement and two separate lending agreements without Mr. Cruz's knowledge or assent.

4.      Regarding the Service Finance loan, Attyx saddled Plaintiff with a loan of $50,000 for the roofing work that Attyx promised would be free.  Plaintiff never agreed to those terms.  Instead, Attyx forged Plaintiff's signature on an electronically generated loan agreement with Service Finance.  Neither Attyx nor Mosaic nor Service Finance provided Plaintiff with any of the legally required disclosures or hard copies (or virtual copies) prior to Plaintiff agreeing to install the Solar System.  Each of the purported contracts are void *ab initio*.

5.      It was only after Attyx installed the Solar System that Plaintiff discovered Attyx had fraudulently affixed his signature to the sales agreement and that the terms set forth in the sales agreement were significantly higher than promised and contained terms that were not agreed to by Plaintiff.  Defendant Young signed the purported sales contract on behalf of Attyx.

6.      The exorbitant $100,300 charge is comprised of at least three elements: (1) the Solar System cost which Attyx valued at approximately $43,234; (2) an undisclosed finance charge in the form of a dealer fee (or dealer's points) to Mosaic related to the fraudulent loan of at least $7,066; and (3) $50,000 for the roofing work (which Attyx promised would be free but then fraudulently opened a loan for Mr. Cruz through Service Finance).  Attyx did not provide Mr. Cruz with a copy of the installation contract until well after it was fraudulently signed, and Mr. Cruz, to date, has not received any purported loan agreements from either Mosaic or Service Finance.

7.      Mr. Cruz's experience fits the mold of the broader fraud perpetrated by Defendants Attyx, Young, Payne, Mosaic, and Service Finance on thousands of other consumers. The general mechanics of the fraud are as follows.  *First*, Attyx, and Defendants Young and Payne as principals of Attyx and architects of the fraud, engaged in mass false advertising and consumer-specific false advertising to induce consumers to purchase exorbitantly priced solar systems and home improvement services.  Attyx repeatedly falsely promised consumers that: (1)

3

Attyx would provide free roof replacements (and other free home improvement services); (2) Attyx would provide solar systems at low cost (usually based on the notion of illusory tax savings); and (3) that the Attyx solar systems would significantly reduce or eliminate monthly electric utility bills (which was also untrue as set forth below).  In truth, none of the roof replacements or home improvement work was actually free; instead, Attyx fraudulently baked in the price of the home improvement work into its quote for the solar system, and then fraudulently signed consumers up for loans to pay for the same (in Plaintiff's case through Service Finance).

8.      *Second*, Attyx salespeople secured consumer signatures on exorbitant contracts for solar systems and home improvement services under false pretenses, either by causing consumers to tap devices controlled by the Attyx salespeople without providing an opportunity to review the documents (including the terms, conditions, or truth-in-lending disclosures), by telling consumers that they were merely agreeing to credit checks, then causing consumers to tap or sign tablets without knowingly agreeing to any purchase or loan at all, or by forging consumers' signatures on the purported agreements.

9.      *Third*, Attyx ensured it got paid by deceptively and fraudulently originating loans for consumers which allowed Attyx to be paid, and the consumer to be saddled with debt, by the time the fraud was uncovered.  This practice was done with the knowledge and agreement of Attyx's lending partners, including Mosaic and Service Finance, which had preexisting agreements with Attyx and engaged in the scheme with Attyx to bind consumers to fraudulent loan agreements and to extract high monthly payments under threat of default on the loan (Mosaic placed fraudulent liens on properties, including Plaintiff's property, by filing UCC-1 financing statements related to solar fixtures, fraudulently encumbering consumers' properties).

4

For its part, Mosaic also used this scheme to realize lucrative undisclosed finance charges (i.e. dealer fees) which were not disclosed to the consumer.

10.    The result of the above-mentioned fraud is that all Defendants got paid and benefited at the direct expense of Plaintiff and class members. Attyx is paid by its lending partners (i.e. Mosaic, Service Finance, WebBank), usually even before the solar system is completely installed or operational, and the lending partners hold exorbitant loans comprised of the cost of the solar systems and the (purportedly free) home improvement work.  Mosaic and WebBank also fraudulently received undisclosed dealer fees that range anywhere from 9-54% of the total cost of the system.  This arrangement also allowed Attyx to abandon the customer when the customer comes to find out (as Mr. Cruz did), that the purchased solar system does not perform as represented or is otherwise defectively installed (because they have already been paid by the lending partner and are effectively out of the deal).  This scheme was repeated thousands of times, leading to substantial profits by both Attyx and its lending partners, all at the expense of often vulnerable consumers.

11.    This exact conduct has led the New York Attorney General to file a lawsuit against Defendants Attyx, Young, Payne, Mosaic, and others, which makes substantially similar allegations to those alleged here.[1] [2]  The New York Attorney General estimates that the unlawful practices alleged herein have resulted in damages/potential restitution of approximately $275,000,000 in New York alone.  *See* Ex. A, ¶ 25.

12.    In or around June 2025, Mosaic filed for Chapter 11 bankruptcy, which concluded in or around September 2025.  As a result of the bankruptcy proceedings, Mosaic transferred its loan-servicing arm to Defendant Solar Servicing.  As set forth below, Mosaic is still liable to

---

[1] https://ag.ny.gov/press-release/2026/attorney-general-james-sues-home-solar-power-company-and-lenders-cheating-new

[2] A copy of the filed New York Attorney General Complaint is attached hereto as **Exhibit A**.

Plaintiff, but Defendant Solar Servicing is also liable as the holder of the Mosaic loans. *See* 16 C.F.R. § 433. The FTC Holder Rule protects consumers by allowing them to assert the same legal claims and defenses against a lender (or "holder" of a credit contract) that they could have used against the original seller.[3] Similarly, Mosaic, Service Finance, and WebBank are liable both for their direct actions and also as holders under the FTC Holder Rule.

13.    Plaintiff, on behalf of himself and others similarly situated, brings this action against Defendants for: (i) fraud; (ii) negligent misrepresentation; (iii) violation of New York General Business Law §§ 349; (iv) violation of the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq*.; (v) violation of New York's Uniform Commercial Code; and (vi) unjust enrichment.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, namely TILA. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

16.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Attyx has a principal place of business in this District, does business throughout this District, and because Plaintiff resides in this District and purchased the Solar System at issue in this District.

---

[3] https://www.ftc.gov/legal-library/browse/rules/holder-due-course-rule#:~:text=The%20Holder%20in%20Due%20Course%20Rule%2C%20also,a%20consumer's%20credit%20contracts%20to%20other%20lenders.

**PARTIES**

17.     Plaintiff Elmer Cruz is a resident of Rockaway, New York, and is a citizen of the state of New York who purchased a Solar System from Attyx on false pretenses, as set forth herein.  Specifically, in or around July 2024, Attyx represented to Plaintiff that it would install the Solar System for a total-out-of-pocket cost of $28,520 to Plaintiff, that Plaintiff would receive a completely free roof replacement as an incentive for installing the Solar System, that Plaintiff would only pay $167 a month (which Plaintiff believed would be paid to Attyx), and that Plaintiff's Solar System would reduce or even eliminate his electric utility expenses.  As set forth herein, none of that was true; instead, Defendant charged Plaintiff $100,300 which included the cost of the Solar System, an undisclosed dealer fee to Mosaic, and $50,000 for the roof replacement Plaintiff was promised would be free.  Defendant Attyx, along with Mosaic and Service Finance, fraudulently obligated Plaintiff to $100,300 in loans Plaintiff did not agree to, which amount to approximately $180,000 when factoring in the dealer fee and interest over the life of the loans.  The above-mentioned events took place at Plaintiff's home in Rockaway, New York.

18.     Defendant Attyx, LLC is a New York limited liability company formed on August 1, 2019, with offices at 150 Eileen Way, Suite 5, Syosset, New York.  Attyx, LLC also does business from offices in Lehi, Utah.  Attyx, LLC was previously registered with the New York Department of State ("DOS") as SUNco Capital, LLC. SUNco Capital filed articles of organization with DOS on or about August 1, 2019, and filed paperwork with DOS to change its name to "Attyx" on or about January 23, 2024.  Attyx, LLC has done business under several other names, including "SUNco Solar," "SUNco Roofing and Solar," "Attyx Roofing," "Attyx Solar LLC," "New York Roofing," and "LGCY Power."

19. Attyx New York LLC is a New York limited liability company formed on December 14, 2023. Attyx New York does business from Attyx, LLC's office at 150 Eileen Way, Suite 5, Syosset, New York.

20.     Both Attyx, LLC and Attyx New York did business under the names "Attyx" and "Attyx Solar LLC." In addition to sharing the same brick-and-mortar address, Attyx, LLC and Attyx New York shared the same phone number (212-390-0838); used the same email addresses and email domain name (attyx.com) in their communications; used the same license number 2108844-DCA, which was issued to Attyx, LLC by the New York City Department of Consumer and Worker Protection; and, according to the New York Attorney General, commingled their assets, both in their receipt of revenues and in their payment of expenses. Attyx, LLC and Attyx New York promoted their services to potential customers using the same advertising and used the alias "New York Roofing" when communicating with consumers, including in the companies' advertising. Both Attyx, LLC and Attyx New York were supervised by Defendants Young and Payne as the companies' officers and were operated by the same employees.

21.     Defendant Grant Young is a co-founder, co-owner, and co-Chief Executive Officer ("co-CEO") of Attyx, along with Defendant Payne, is Attyx's President and Chief Financial Officer, and participated in and had knowledge of the practices of Attyx as set forth herein. Young is a resident of Utah.  Defendant Young signed the fraudulent sales contract with Plaintiff on behalf of Attyx New York LLC.

22.     Defendant Benson Payne is a co-founder, co-owner, and co-CEO of Attyx, along with Young, and participated in and had knowledge of the practices of Attyx as set forth herein. Payne is a resident of Utah.

23.     Defendant Solar Mosaic LLC is a Delaware limited liability company operated from offices in Oakland, California.  Mosaic was one of Attyx's lending partners.  Mosaic acted

as a direct lender in issuing solar loans to Attyx customers and as an intermediary in designing, brokering, and/or servicing other solar loans for Attyx customers from Defendant WebBank. Mosaic filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code on or about June 6, 2025, and confirmed a plan of bankruptcy reorganization on or about September 5, 2025. Despite the confirmation of a plan of reorganization, Solar Mosaic has continued existence as a separate legal entity, and its reorganization plan preserves Plaintiff's claims against Mosaic.

24.     Defendant Solar Servicing, LLC is a Delaware limited liability company with a principal place of business in Chevy Chase, Maryland.  In or around September, 2025, Solar Servicing acquired the loan servicing operations of Mosaic following Mosaic's Chapter 11 Plan of Reorganization.  Mosaic's loan servicing operations have been successfully transitioned to Solar Servicing.  Solar Servicing is liable for the claims set forth herein under the FTC Holder Rule.

25.     Defendant WebBank is a Utah business corporation operated from offices in Salt Lake City, Utah.  WebBank was also a lending partner of Attyx and was lender for certain solar loans designed, brokered and/or serviced by Mosaic.  WebBank is a Utah State-chartered industrial bank with a principal place of business at 215 South State Street, Suite 1000, Salt Lake City, Utah 84111.  WebBank finances Mosaic's loans and is often the originator of Mosaic branded loans.

26.     Defendant Service Finance Company, LLC is a Florida limited liability company with a principal place of business in Boca Raton, Florida.  Service Finance acted as a direct lender in issuing home improvement loans to Attyx customers.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Experience

27.    In or around July 2024, two representatives from Attyx contacted Plaintiff and came to his home to sell him on installing a Solar System.

28.    The Attyx representatives promised Plaintiff that he would only have to pay $28,520 out of pocket for the Solar System.

29.    The Attyx representatives further promised that Plaintiff would only need to pay $167 per month for the Solar System and that his electric utility bills would be substantially reduced or eliminated.  Based on Attyx's representations, Plaintiff believed he would be paying $167 per month to Attyx for the Solar System.

30.    The Attyx representatives further represented to Plaintiff that he would get significant tax benefits from installing the Solar System.

31.    The Attyx representatives further represented that Attyx would replace Plaintiff's roof for free if he agreed to install the Solar System.  The Attyx representatives stated to Plaintiff that he would save significant money because of the free roof replacement.

32.    The Attyx representatives further represented that Attyx would provide Plaintiff with a $6,000 cash incentive if he agreed to install the Solar System.

33.    Each of the above-referenced representations by Attyx were knowingly false. Contrary to Attyx's representations, Plaintiff did not pay $28,520 out-of-pocket; instead, Attyx charged Plaintiff $100,300 in total, over three times the promised cost.  Plaintiff did not sign Attyx's sales agreement which purported to bind him to a $100,300 Solar System.  Instead, Attyx's salesmen made oral representations to Plaintiff, which he relied upon, and then generated an electronic agreement and affixed Plaintiff's signature without providing him with an opportunity to either review or sign the contents of the sale agreement.

10

34.     Attyx also fraudulently arranged for two separate third-party loans through Mosaic and Service Finance.  Not only did Plaintiff not agree to third-party financing, but these loan agreements bound Plaintiff to monthly payments that far exceed the promised $167 per month (and which increase over time). These loans, when factoring in interest and Mosaic's undisclosed dealer fee, increased Plaintiff's total out-of-pocket expenditure to approximately $180,000 (approximately six times the quoted price of $28,520).  Plaintiff did not sign any lending agreement with either Mosaic or Service Finance which purported to bind him to two separate loans totaling $100,300.   Instead, Attyx's salesmen generated electronic loan agreements from their electronic devices and fraudulently affixed Plaintiff's signature without providing him with an opportunity to either review or sign the contents of the loan agreements. Plaintiff had no idea Attyx was purporting to bind him to loan agreements.  It was not until much later, when Plaintiff received correspondence from Mosaic and Service Finance, that he realized what had happened.

35.     Plaintiff did not receive the full tax benefits promised by Attyx.  The Solar System did not significantly reduce or eliminate Plaintiff's electrical utility bill as Attyx had promised.  Indeed, Plaintiff's Solar System has not performed as promised by Attyx, causing Plaintiff to have to pay for both the Solar System and high utility bills.

36.     Attyx did not replace Plaintiff's roof for free.  Instead, it fraudulently originated a $50,000 loan through Service Finance in Plaintiff's name to pay for the roof Plaintiff was promised would be free.   More than that, any applicable solar tax credits or benefits are inapplicable to home improvement work such as a roof replacement, rendering Attyx's representation regarding tax benefits false.

37.     Contrary to Attyx's representations, it never provided Plaintiff with the promised cash incentive of $6,000 (or any amount).

38.    Regarding the purported Mosaic loan, Attyx and Mosaic fraudulently obligated Plaintiff to an undisclosed dealer fee of at least $7,066.  According to Attyx, the cost of Plaintiff's Solar System was approximately $43,234.  However, Attyx and Mosaic fraudulently originated a loan in Plaintiff's name for $50,300.  The difference represents the undisclosed dealer fee.  In short, Mosaic, with Attyx's support and agreement, adds an undisclosed dealer fee into the cost of the Solar System.  This dealer fee is not paid by Attyx to Mosaic; rather, Mosaic adds it to the principal loan amount without notifying the consumer, increasing the cost of the system significantly.  Mosaic's dealer fee is an unlawful, undisclosed finance charge under state and federal law which both increased the total amount loaned to Plaintiff with no corresponding benefit or notice, and deprived Plaintiff of the ability to negotiate better terms.

39.    As a direct and proximate result of Defendants misrepresentations and omissions, Plaintiff suffered damages in the form of, *inter alia*, paying substantially more for the Solar System than promised, being hoodwinked into a $50,000 loan for a roof replacement he was promised would be free, and paying an undisclosed finance charge in the form of the dealer fee collected by Mosaic.

40.    Plaintiff's experience corresponds with the findings of the New York Attorney General, which stated in its similar lawsuit that it "received more than 200 complaints from consumers concerning Attyx."  *See* Ex. A, ¶ 52.  The New York Attorney General investigated Attyx and lending partners Mosaic and WebBank.  *Id.* ¶¶ 53, 56.  Through its investigation, the New York Attorney General determined that Attyx and certain of its lending partners "have repeatedly engaged in fraudulent and illegal conduct in the sale and financing of Solar Systems and other services" based on the same practices alleged herein.  *Id.* ¶ 57.  The New York Public Service Commission ("NYPSC") has made similar findings.  *Id.* ¶¶ 27-28.

41.     Mosaic has also received scrutiny from several state Attorneys General regarding undisclosed financing charges.  *Id.* ¶ 32.

**B.  Attyx Falsely Advertises Its Services**

42.     Defendants Young and Payne, Attyx's co-CEOs, launched Attyx in New York in or around 2019. The company first operated under the name SUNco Capital and then changed its name to Attyx in 2024.

43.     Attyx operates in numerous markets throughout the United States. Attyx has announced that it operates in or is in the process of launching operations in California, Texas, New Jersey, Virginia, North Carolina, South Carolina, and Hawaii.

**1.     Attyx Falsely Advertises Its Services on the Internet**

44.     Attyx repeatedly marketed its services to consumers by promising them solar systems combined with free home improvements, including free roofs and HVAC systems. Attyx advertised that such services were provided for free.  Indeed, on its website, Attyx states: "Get a $0 out-of-pocket new roof installed by bundling with solar!"[4]





---

[4] https://attyx.com/roofing/bundle-with-solar/

45.     Attyx made similar representations regarding HVAC replacements, stating that by bundling HVAC with solar, the HVAC home improvement would be "as low as $0 out-of-pocket" and that a consumer could get a "new HVAC system and solar panels at no up front cost to you."[5]

# $0 Out-Of-Pocket Financing

By bundling your HVAC with solar you qualify for getting your home improvement for as low as $0 out-of-pocket! A new HVAC system and solar panels at no up front cost to you. You only pay a fixed/locked in home improvement bill until your power is owned. Which is typically less expensive than your current utility bill.

46.     Attyx repeatedly made these and similar false representations in each state it operated in.

47.     Attyx advertised that consumers could obtain its services for "free," at "no cost," for "no money out of pocket," or similar language.

48.     Attyx frequently pressured consumers by stating that such programs had limited space available and that consumers needed to respond quickly to obtain such free services.

49.     Attyx advertised that as the result of purchasing Solar Systems from Attyx, consumers would enjoy greatly reduced monthly expenses compared to their pre-installation electrical bills.

---

[5] https://attyx.com/roofing/bundle-with-solar/

50.     Attyx repeatedly advertised its products and services under the name "New York Roofing" through social media, including Facebook.

51.     One of Attyx's ads showed a man wearing a shirt with a logo stating, "NYRoofing" and standing in front of a row of houses, and stating as follows:

> Does your roof need to be replaced? New York programs will pay for your roof completely. Yes, this is real. . . . For years, over 500,000 homeowners have been getting energy-efficient tax breaks and even cash payouts. This is no different. New York homeowners are able to get a brand-new solar system and complete re-roof at no cost through these programs. This is done by cashing in on subsidies and credits up-front. . . . New roof, new solar, replacing your current electric bill with a payment that is cheaper . . . . Space in this program is extremely limited; before filming this video we had around 30 slots left.

Ex. A, ¶ 72.

52.     By advertising that consumers could "cash[] in on subsidies and credits up-front," Attyx represented that it enabled consumers to take advantage of government programs that would immediately cover their roof replacement costs.

53.     Another Attyx ad showed a man standing in front of a house with a ladder leading to its roof, and stating as follows:

> Hey New York: If you have a broken HVAC system or no HVAC system at all, there's new funding available to completely replace your HVAC at no cost to you. How so? It's because New York has unlocked millions of dollars of funding for programs like this to upgrade your home. This funding is limited, and it's going fast, but here at Attyx, we can help you navigate these programs, no problem at all.

Ex. A, ¶ 75.

54.     By stating that it could help consumers "navigate these programs," Attyx represented to consumers that it would advise them on how to obtain valuable and scarce benefits from the government.

15

55.    Attyx repeatedly advertised its purportedly free services as being part of special programs, such as the so-called "Roof Rescue Program," which it represented were exclusively available for New York homeowners.  In one Attyx ad promoting the Roof Rescue Program, a man standing on a sidewalk, as shown below, stated as follows:

> New York homeowners: If your roof is leaking, damaged, or even if it's just old, you can save anywhere from $5,000 to $15,000 with a free roof replacement covered entirely by the Roof Rescue Program. . . . I'm talking about an entire roof replacement for free. . . . [W]ith the Roof Rescue Program for New York homeowners only, you can get one for free.

Ex. A, ¶ 78.

56.    In another Attyx ad the speaker said: "Get a roof at no cost. The brand-new Inflation Reduction Act is covering the costs of new roofs for homeowners in New York City. If you need a new roof and don't want to pay for it, apply now."  Ex. A, ¶ 80.

57.    Another ad featured a man wearing a shirt with an Attyx logo and standing in front of a van and a stack of air conditioners, as shown in the image below. The man stated:

> [M]any of our customers choose to bundle the replacement of their HVAC system with rooftop solar. By doing this, we can replace and virtually eliminate your utility bill and put everything into one low, fixed monthly price that's easy to afford.

Ex. A, ¶ 81.

58.    Attyx made numerous similar representations regarding free roofs to consumers throughout the relevant time period.

59.    The representations in Attyx's ads were false.

**2.    Attyx Makes False Representations Through Its Salespeople**

60.    In addition to its advertising, Attyx also misrepresented its services and the financial burden that consumers would bear through its salespeople, who made pitches to consumers in their homes.  These sales pitches were delivered off of a script, which instructed

Attyx salesman to provide consumers with a battery of the same false promises and misleading information.

61.     Attyx's salespeople introduced themselves to prospective customers through any of three means: (1) contacting consumers who responded to Attyx's advertising, (2) contacting consumers who had been referred to Attyx by other consumers, or (3) making unsolicited "cold calls" to consumers, either by telephone, email, or door-to-door solicitation.

62.     As in Attyx's advertising, Attyx's salespeople repeatedly represented to consumers that Attyx would provide them with solar systems and other home improvement work for free, at no cost, or for no money out of pocket.

63.     Attyx represented to consumers through its representatives that solar tax credits would provide them "money back" from the government (or similar language) that would help them pay for the solar systems.

64.     Attyx's salespeople repeatedly represented to consumers that their monthly electrical expenses would be significantly reduced or even eliminated as the result of purchasing Attyx's solar systems and that their monthly expenses would not exceed certain amounts, or even that the Attyx solar system would replace their monthly electrical bills with positive credits from the electrical utility company.

65.     These representations were false, as set forth herein.

66.     During their in-person sales pitches in consumers' homes, Attyx's salespeople repeatedly used high-pressure tactics to push consumers to purchase solar systems. Such tactics included creating a false sense of urgency and pushing consumers to respond quickly to Attyx's sales pitches, criticizing the choices of consumers who were reluctant to do business with Attyx, and further misrepresenting Attyx's services and the prices consumers would pay for them.

17

67.     Attyx used the above-described pressure tactics combined with deceptive practices surrounding its sales agreements such that customers lacked mutual assent to the terms of Attyx's sales agreements.    Attyx generated its sales agreements through software and routinely fraudulently affixed consumer signatures to sales contracts, either by causing a consumer to click an electronic device without permitting them to review contract terms or providing a hard copy agreement for review, by causing consumers to e-sign agreements under false pretenses, such as by misrepresenting that they were merely authorizing credit checks or completing initial, pre-contract applications.  On occasion, Attyx's salespeople simply forged consumers' e-signatures on agreements by tapping the screens of their computers or mobile phones themselves.  Attyx followed the same fraudulent procedures in connection with the loan agreements with Mosaic, Service Finance, and WebBank.  Mosaic and Service Finance had agreements with Attyx permitting Attyx to generate loan agreements electronically.

68.     Attyx did not provide written sales agreements or lending agreements to consumers prior to binding consumers to the same via fraudulent means, or within a reasonable time after binding consumers to said contracts such that the cancellation period of the contract expired by the time the consumer saw it.

69.     When consumers learned of sales agreements and loan agreements they had purportedly executed, they often complained that they had not knowingly executed the agreements or had not executed them at all.

70.     When consumers contacted Attyx to ask about the salespeople's representations or about the unexpected financial obligations the consumers were saddled with by Attyx and its lending partners, Attyx repeatedly stopped taking the consumers' calls.

71.     Attyx continued to work with salespeople who were the subject of such complaints even after learning of their practices through consumers' complaints.

72.   The NYPSC observed in its November 2025 Final Order revoking Attyx's license[6] to operate as a solar energy distributor that Attyx did not "engage with allegations that its sale representatives used aggressive, high pressure tactics or misrepresented savings to convince prospective customers to enroll"; did not "indicate that it identified, disciplined, or terminated any problematic sales representatives"; and offered no "solution to ensure that its concerning marketing tactics no longer continue."  Ex. B, at 10.

73.   Attyx's representations to consumers concerning free solar systems and home improvements, reduced monthly expenses, and low "Net System Costs" due to government incentives were false and misleading.

74.   By luring consumers with such false promises, Attyx saddled them with obligations to repay tens of thousands or over a hundred thousand dollars per consumer, far beyond Attyx's representations and far beyond any amounts the consumers would have knowingly agreed to.

75.   None of Attyx's products and services were available to consumers for free or for no "out of pocket" costs, as Attyx represented. Attyx did not connect consumers with government programs that provided them with free solar systems or other free home improvement work. There was no government program called the "Roof Rescue Program" that provided consumers with free roofs, as represented.

76.   The NYPSC found in its November 2025 Final Order that Attyx's practice of "advertising products and services as 'no cost' that have associated costs is inherently problematic and misleading."  Ex. B, at 9.  The NYPSC further found Attyx "engag[ing] in

---

[6] The November 17, 2025 NYPSC Order Revoking Attyx, LLC's Eligibility to Serve Customers in New York ("Final Order") is attached hereto as **Exhibit B**.

misleading or deceptive conduct" and by "mak[ing] false or misleading representations including misrepresenting rates or savings offered." Ex. B, at 8, 18.

77.    Attyx's representations concerning consumers' ability to pay for their solar systems and other work using tax credits were false and misleading.

78.    Attyx's representations that consumers could reap immediate financial benefits from solar tax credits were plainly false, as taxpayers could take advantage of individual income tax credits only by filing tax returns after a given tax year.    Even then, in many cases any available tax credits were either unavailing or far below the value Attyx represented they would be.

79.    Also false and misleading were Attyx's representations that solar tax credits would provide consumers with money – e.g., "money back" from the government – that they could use to pay for solar systems.

80.    The solar tax credits Attyx promoted included those provided by the United States and New York governments through the federal Residential Clean Energy Credit and the New York Solar Energy System Equipment Credit, respectively. These were nonrefundable tax credits and did not provide taxpayers with "money back," as Attyx represented, absent other bases for a tax refund.  A nonrefundable tax credit is one that can decrease a taxpayer's tax liability but cannot decrease the tax liability below zero – as opposed to refundable tax credits that can be paid back as a refund in the amount they exceed liability.  Therefore, consumers had to pay the full prices of the solar systems from their personal savings or other resources.

81.    Taxpayers who are able to take advantage of nonrefundable tax credits are likely to be higher-income taxpayers, as higher-income taxpayers are more likely than lower-income taxpayers to face tax liability when filing for taxes. Lower-income taxpayers, by contrast, are

20

more likely to receive little or no benefit from nonrefundable tax credits because they owe less in federal income taxes – and often owe nothing at all after applying tax deductions.

82.    Attyx's salespeople repeatedly sold solar systems to lower-income consumers (like Plaintiff) and locked them into solar loans with exorbitant monthly payment amounts even after the consumers informed the salespeople that they had low incomes, were retired and on fixed incomes, and/or did not file tax returns.

83.    When consumers (like Plaintiff) were unable to prepay their solar loans due to their non-receipt of refund checks from the government for their solar tax credits, the lenders repeatedly "re-amortized" the loans to provide for monthly payments higher than the consumers had been paying previously.

**C. Attyx Inflated the "System Costs" to Include Expenses for Home Improvement Work It Represented to Be Free and To Include Undisclosed Financing Charges Levied by Mosaic and WebBank**

84.    Attyx fraudulently included in the cost of its solar systems (1) the cost of the home improvement work it promised would be free, and (2) and the cost of undisclosed finance charges (i.e. Mosaic's dealer fees).  Attyx fraudulently represented to customers that the quoted price was only for the cost of installing solar systems, which Attyx fraudulently referred to as "System Costs."

85.    First, Attyx fraudulently included in its System Costs the prices it charged consumers for non-solar work, including roofing and HVAC services, which repeatedly amounted to undisclosed costs in excess of $10,000 per consumer.  In Plaintiff's case, it was $50,000.

86.    Attyx's non-solar home improvement work was not free, despite Attyx's representations to the contrary. Attyx did not connect consumers with government programs that

21

provided them with free roofs, HVAC systems, or other home improvement work, and Attyx, as a profit-motivated business, did not perform such work out of charity.

87.     Second, Attyx included in its stated System Costs the amounts of undisclosed dealer fees/loan surcharges charged by Mosaic and WebBank, which were finance charges required to be disclosed to consumers under New York law and the Truth in Lending Act, as set forth herein.  By misrepresenting these dealer fees/loan surcharges as portions of its System Costs, which were purportedly its prices for the purchase and installation of its solar systems, Attyx enabled Mosaic and WebBank to charge said undisclosed fees to consumers without the consumers learning they were doing so.

88.     In its November 2025 Final Order revoking Attyx's license to engage in the solar business, the Public Service Commission concluded that Attyx had repeatedly violated New York law "by failing to include" in its sale agreements "'the total system purchase price, itemized costs of system components, and any other taxes, fees or overheads that are the responsibility of the customer.'"  Ex. B, at 19.

89.     By concealing from consumers the prices for its non-solar home improvement work and the existence and amounts of Mosaic's and WebBank's dealer fees, Attyx caused consumers to pay prices tens of thousands of dollars higher than they would have paid absent such undisclosed charges.

90.     By concealing these amounts from consumers, Attyx also made it difficult, if not impossible, for consumers to properly apply for solar tax credits, since such credits may be granted only for the costs of solar systems, not for Mosaic's or WebBank's dealer fees or non-solar home improvement work.

**D. Mosaic Paid Attyx Regardless of Whether Its Work Was Complete**

91.     Mosaic and Attyx conspired to permit Attyx to be paid for incomplete work. Attyx included in its sale agreements (which Plaintiff did not agree to) clauses stating that consumers were required to execute "Notice[s] of Completion" within 5 days of "substantial project completion," which Attyx defined merely as "all major solar components installed," defined as "Racking, Solar PV Modules & Inverter(s)" (or similar language).

92.     The language of Attyx's "substantial project completion" clauses allowed it to deem its work complete when it had done nothing more than install the "major solar components" of its solar systems on consumers' roofs – regardless of whether it had installed *all* components required for complete solar systems; whether the solar systems generated electricity, performed to standards represented by Attyx, complied with applicable code standards, and were connected to the electrical grid; or whether Attyx had satisfactorily completed roofing, HVAC, or other home improvement work it had represented to consumers it would provide.

93.     Attyx's sales agreements further provided that if consumers failed to execute such Notices of Completion when Attyx's low standard of "substantial project completion" was met, Attyx would "irrevocabl[y]" be deemed the consumer's "Agent to sign and record a Notice of Completion on behalf of Owner" (or similar language).

94.     Attyx included such clauses in its agreements to easily claim that it satisfied milestones set by Mosaic or WebBank to receive disbursement of funds from them, even when its work at consumers' homes was incomplete.

**E. Mosaic, WebBank, and Service Finance are Liable to Plaintiff and Class Members Directly for Their Own Conduct; Mosaic, WebBank, Service Finance, and Solar Servicing Are Liable As Holders of Solar Loans Issued to Attyx Customers and as Parties Necessary for Rescission**

95.     Attyx worked directly with Mosaic to arrange loans for Attyx customers. In some cases, Mosaic designed and serviced the solar loan and lent money to the consumer as the lender.

23

In other cases, Mosaic acted as an intermediary wherein Mosaic interacted with Attyx and designed, brokered, and/or serviced the solar loan but WebBank would lend the money to the consumer as the lender.

96.    Although the loan agreements for Mosaic and WebBank were in their names, Attyx's salespeople generated loan agreements from their electronic devices.

97.    Attyx had a similar arrangement with Service Finance, which provided loans for purportedly free home improvement services (such as roofing services), wherein Attyx salespeople generated loan agreements from their electronic devices.

98.    Attyx's salespeople used software provided by Mosaic and Service Finance to generate loan agreements. Attyx then used the same fraudulent means described in paragraph 67, above, to fraudulently cause a consumer's signature to be entered on a purported loan agreement.

99.    Through such practices, Attyx's lending partners (Mosaic, WebBank, and Service Finance) issued loans to consumers or caused loans to be issued to consumers who had not been provided the loan agreements' terms, conditions, and truth-in-lending disclosures. In many cases, such as in Plaintiff's case, consumers did not even know they were signing up for a loan agreement.

100.    Mosaic and WebBank repeatedly caused consumers to pay them thousands of dollars apiece in dealer fees associated with solar loans, which were undisclosed to the consumer (both because consumers were never presented with the terms of the purported loan agreements and because even if they were, the dealer fees and surcharges were undisclosed and lumped into the "System Cost").

101.    Mosaic and WebBank were required to accurately disclose dealer fees/loan surcharges to consumers under both state and federal law, including under General Business Law § 349 and TILA, 15 U.S.C. § 1601, *et seq.*; Regulation Z, 12 C.F.R. Part 1026.

102.    Mosaic and WebBank charged the undisclosed dealer fees/loan surcharges to consumers to deceptively extract more money from consumers without any notice to consumers.

103.    According to the New York Attorney General, in a hearing before the NYPSC, Payne repeatedly referred to the Loan Surcharges as a "kickback" collected by Attyx's lending partners, including Mosaic and WebBank.  Ex. A, ¶ 233.

104.    Mosaic's and WebBank's truth-in-lending disclosures to Plaintiffs and class members failed to accurately disclose the loans' finance charges, amounts financed, and APRs because they omitted the dealer fees/loan surcharges and simply lumped the same into the "Amount Financed."  Because Mosaic and WebBank overstated the loans' amounts financed and understated their finance charges, they also misstated the loans' APRs, which were calculated based in part on the amounts financed and finance charges.

105.    By understating the solar loans' finance charges and APRs, Mosaic and WebBank made it appear that they charged far less in finance charges and interest than they actually charged.

106.    By falsely including the fees/loan surcharges within the lump-sum "Amount Financed" amounts stated in their loan agreements, Mosaic and WebBank made it falsely appear that the purported amounts financed, including the dealer fees/loan surcharges, were simply the costs of the solar systems sold by Attyx.

107.    Consumers who financed their solar systems through Mosaic and WebBank did not learn that they were being charged the dealer fees/loan surcharges.

108. By concealing their finance charges in this way, Mosaic and WebBank caused consumers to pay thousands of dollars more for their loans than they would have paid absent such undisclosed charges. By concealing their finance charges, Mosaic and WebBank also prevented consumers from negotiating with lenders the amounts of the surcharges, or whether they would be charged at all, and made it difficult, if not impossible, for consumers to accurately comparison-shop between loans from Mosaic/WebBank and loans from other sources.

109. Mosaic and WebBank repeatedly issued solar loans to consumers and/or arranged for solar loans to be issued to consumers utilizing loan agreements that failed to disclose the existence or amounts of the loan surcharges, either in the "Finance Charge" box of the truth-in-lending disclosures or elsewhere, and instead included such amounts as part of the "Amount Financed," misstating the loans' APRs as a result.

110. Mosaic and WebBank structured the solar loans, with the agreement and support of Attyx, to include the dealer fees/loan surcharge amounts and to charge such amounts to consumers.

111. Mosaic and WebBank made it a practice to charge the highest loan surcharges to the consumers who were charged the lowest APRs. For example, a consumer who was charged a seemingly attractive APR of 3.99% could be charged an undisclosed loan surcharge reflecting over 30% of Attyx's System Cost, negating much of the value the consumer was seemingly receiving as a result of the low APR.

112. Attyx participated in this scheme by including both the cost of the solar system and the undisclosed dealer fee/loan surcharge as the system cost, even though it was really the system cost plus the undisclosed dealer fee.

113. Attyx and Mosaic memorialized the practice of causing consumers to pay undisclosed dealer fees/loan surcharges in agreements among them. In them, Attyx and

26

Mosaic/WebBank agreed that the lenders would not pay Attyx the full prices stated in Attyx's sale agreements with consumers but would instead deduct certain amounts – the dealer fees/loan surcharges – from Attyx's stated prices and would disburse to Attyx the difference.

114. Mosaic's agreement with Attyx referred to loan surcharges as "Dealer's Points" and stated, "Dealer agrees to accept the Loan Amount, minus the applicable Dealer's Points . . . (the 'Net Loan Amount') in full satisfaction of the amount owed by the applicable Customer." The agreement was dated February 14, 2020 and was signed by Attyx co-CEO Young.

115. To the extent that Attyx or Mosaic/WebBank represented the loan surcharges as "fees," "Dealer's Points," or "seller's points" paid by Attyx, any such representation was false and a ruse, concocted in an attempt to avoid liability for charging borrowers undisclosed finance charges.

116. In practice, Attyx did not pay the lenders any such fees or points. Instead, Attyx passed the costs of the dealer fee/loan surcharges on to consumers by inflating its stated System Costs to include the surcharge amounts.

117. Attyx did not charge loan surcharges to consumers who paid in cash. Instead, Attyx charged lower prices to cash buyers than it charged to customers paying through loans from Mosaic/WebBank.

118. The purported loan agreements for lenders Mosaic, WebBank, Solar Servicing, and Service Finance each include clauses stating that the holders of such notes are subject to all claims and defenses that can be asserted against the seller of the goods or services obtained with the proceeds of the loan. 16 C.F.R. § 433.

119. Accordingly, each claim brought herein against Attyx is also brought against Mosaic, WebBank, Service Finance, and Solar Servicing to the extent that any such company is the holder of a solar loan or home improvement loan issued to a customer by Attyx.

120.    In addition, to the extent that Mosaic and/or WebBank and/or Solar Servicing holds solar loans issued to Attyx customers, they are liable as necessary parties for complete relief in the form of recission.  Service Finance is also liable as a necessary party for complete relief in the form of recission regarding the roofing and home improvement work marketed as free by Attyx.

**F.  Defendants Young and Payne were Involved in and Aware of Attyx's Fraudlent and Illegal Conduct**

121.    Young and Payne, Attyx's co-CEOs, were involved in and aware of Attyx's repeated fraudulent and illegal acts alleged herein.

122.    Young and Payne were hands-on managers and closely supervised Attyx's operations.

123.    Young and Payne personally supervised the salespeople's work and were aware of the misrepresentations made by Attyx through its salespeople.

124.    Young and Payne supervised Attyx's production and distribution of advertising to consumers and were aware of the misrepresentations Attyx made in its advertising, including its advertising under the "New York Roofing" name.

125.    Payne was aware that Attyx represented to consumers that it would provide them with solar systems for no money out of pocket.  According to the New York Attorney General, Payne approved of the practice, as indicated in statements he made in a hearing before the Public Service Commission on or about May 16, 2023.  Ex. A, ¶ 266.

126.    Young and Payne included their names as signatories in Attyx's sales agreements, and at least one of the two executed each agreement.  In Plaintiff's case, Defendant Young executed the purported sales agreement.

127.    Accordingly, Young and Payne indicated that they were aware of and approved of the misrepresentations in Attyx's sales agreements, including their misrepresentations

concerning "System Costs," government incentives that were available to consumers, and low net costs that consumers would be responsible for.

128.    Young and Payne were aware that numerous consumers had complained to Attyx that they had not knowingly agreed to the sale agreements and loan agreements, had not been shown the agreements by Attyx's salespeople, did not receive the solar tax credits Attyx had represented were available to them, did not receive solar property tax abatements in the amounts Attyx had represented (if at all), and/or were unable to afford the high prices and high monthly payments charged by Attyx and its lending partners (i.e. Mosaic, WebBank, and Service Finance).

129.    Young, and Payne, were notified by New York State Energy Research and Development Authority ("NYSERDA") in April 2021 that Attyx was required under applicable rules to segregate in its sale agreements the costs of its Solar System work from the costs of its non-solar work, such as roof replacement. Yet they chose not to follow NYSERDA's guidance, and under their supervision Attyx continued drafting sale agreements in which it deceptively included the prices for non-solar home improvement work within its lump-sum "System Cost" amounts for Solar Systems.

130.    Young and Payne were involved in and aware of Attyx's and Mosaic/WebBank's scheme to conceal loan surcharges.

131.    Young signed Attyx's agreement with Mosaic providing for dealer fees/loan surcharges to be deducted from Attyx's stated System Costs.

## CLASS ALLEGATIONS

132.    Plaintiff brings his claims individually and on behalf of the following proposed classes (the "Classes"), defined as follows:

29

**Nationwide Attyx Class**

All natural persons in the United States who purchased a solar panel system from Attyx.

**Nationwide Lender Class**

All natural persons in the United States who borrowed money from Mosaic, WebBank, or Service Finance in connection with the purchase of an Attyx solar system.

**Nationwide FTC Holder Class**

All natural persons in the United States who purchased a solar system from Attyx and have a loan now held or serviced by Mosaic, WebBank, Solar Servicing and/or Service Finance, and who paid any amount of money towards repaying the loan.

**New York Attyx Subclass**

All natural persons in the State of New York who purchased a solar system from Attyx.

**New York Lender Subclass**

All natural persons in the United States who borrowed money from Mosaic, WebBank, or Service Finance in connection with the purchase of an Attyx solar system.

**New York FTC Holder Subclass**

All natural persons in the State of New York who purchased a solar system from Attyx and have a loan now held or serviced by Mosaic, WebBank, Solar Servicing and/or Service Finance, and who paid any amount of money towards repaying the loan.

133. The New York Attyx Subclass, the New York Lender Subclass, and the New York FTC Holder Subclass are collectively referred to as the "New York Subclasses."

134. Excluded from the Classes are: Defendants; any of its corporate affiliates; any of its directors, officers, or employees; any persons who timely elects to be excluded from the Classes; any government entities; and any judge to whom this case is assigned and their immediate family and court staff.

135. Plaintiff does not know the exact number of members in the Classes but reasonably believes that there are at least ten thousand members of the Classes. The members of

30

the Classes are so numerous that joinder of all members of the Classes would be impracticable. The names and addresses of members of the Classes are identifiable through documents maintained by Defendants.

136.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) Whether Attyx fraudulently represented that roofing services would be completely free to consumers;

(b) Whether Mosaic's so-called "Dealer's Points" constitute a "finance charge" under TILA;

(c) Whether Defendants failed to properly disclose Mosaic's "Dealer's Points" to consumers;

(d) Whether Defendants are liable under New York State consumer protection laws asserted herein;

(e) Whether the FTC Holder Rule renders Mosaic, WebBank, Solar Servicing, and Service Finance liable for the misrepresentations of Attyx as alleged herein;

(f) Whether Defendants were unjustly enriched by the alleged unlawful conduct;

(g) Whether Plaintiff and members of the Classes suffered injury as a result of Defendants' false and misleading advertising, and unlawful, unfair, fraudulent or deceptive acts or practices; and

(h) Whether Plaintiff and members of the Classes are entitled to actual damages, statutory damages, restitution, recission, equitable, injunctive or other relief as warranted.

137. Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all members of the Classes are similarly affected by Defendants' wrongful conduct.

138. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

139. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Classes.

140. Plaintiff is represented by counsel competent and experienced in complex consumer class action litigation.

141. The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

142. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense of numerous individual actions. The benefits of proceeding as a class, including providing injured persons with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

143. The prosecution of separate actions by individual members of the Classes is not feasible and would create a risk of inconsistent or varying adjudications.

## FIRST COUNT
### Fraud
### (On behalf of Plaintiff and the Classes Against All Defendants)

144.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

145.    Plaintiff brings this count on behalf of himself and the members of the Classes.

146.    Attyx made numerous material misrepresentations of fact to Plaintiff, including: (1) fraudulently representing to Plaintiff that Attyx would replace his roof for free as an incentive for purchasing a Solar System from Attyx; (2) that Plaintiff would only pay $28,520 out-of-pocket for the Solar System; (3) that Plaintiff's utility bills would be greatly reduced or eliminated as a result of purchasing a Solar System from Attyx; and (4) that Plaintiff would only pay $167 per month for the Solar System.  Each of these misrepresentations by Attyx were material because they induced Plaintiff to proceed with purchasing a Solar System from Attyx. Had Plaintiff known the truth, that the Solar System would cost significantly more than represented and that the roof replacement was not actually free (but rather cost $50,000), Plaintiff would not have agreed to purchase the Solar System.

147.    Attyx fraudulently affixed Plaintiff's signature to its purported sales agreement and to the purported loan agreements with Mosaic and Service Finance.

148.    Attyx also fraudulently concealed and suppressed material facts regarding the Solar System, including that it was signing Plaintiff up for two separate loans from Mosaic and Service Finance which Plaintiff did not agree to, which purported to bind him to loans totaling $100,300, a price which far exceeded the promised $28,520 out-of-pocket.  Plaintiff believed the transaction was between him and Attyx.  Attyx had a duty to disclose this information because Defendant Attyx had superior knowledge of the information regarding the true cost of the Solar System and the financing agreements which were not readily available to Plaintiff, and Attyx

33

knew Plaintiff was acting based on mistaken knowledge. At minimum, Attyx made a partial or ambiguous statement to Plaintiff regarding the cost of the Solar System the meaning of which would only be clear after a complete disclosure of the circumstances by Attyx. In short, Attyx had a duty to inform Plaintiff about the full nature of the transaction to which it sought to bind Plaintiff. Had Plaintiff known the true terms of the transaction Attyx sought to bind him to, he would not have agreed to purchase the Solar System.

149. Attyx also fraudulently concealed and suppressed material facts regarding Mosaic's dealer fee, which was an undisclosed finance charge. Attyx had superior knowledge regarding Mosaic's dealer fee because it had an agreement with Mosaic regarding the same which Plaintiff was wholly unaware of and Attyx knew that the dealer fee was not disclosed to Plaintiff and therefore that Plaintiff was acting on mistaken knowledge. Had Plaintiff been aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the Solar System transaction.

150. Similarly, Mosaic also fraudulently concealed and suppressed material facts regarding its dealer fee, which was an undisclosed finance charge. Mosaic did not disclose the dealer fee to Plaintiff at any time despite knowing that the dealer fee was fraudulently added to the "Amount Financed" such that Plaintiff and class members had no notice of the same. Had Plaintiff been aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the Solar System transaction.

151. Attyx also fraudulently concealed and suppressed material facts regarding the cost of the roofing work it promised would be free, namely that it sought to obligate Plaintiff to a $50,000 loan with Service Finance for the purportedly "free" work. Had Plaintiff known the roof replacement was not actually free and that Attyx sought to bind him to a $50,000 loan for the same, he would not have agreed to proceed with the transaction.

34

152.    At all times, Attyx and Mosaic had knowledge that their respective representations and omissions were false.  Attyx knew that the cost of Plaintiff's Solar System was more than represented to Plaintiff (because it proceeded to charge him $100,300 for the Solar System it represented would cost only $28,520), knew that Plaintiff's roof replacement was not in fact "free" (because it purported to bind Plaintiff to a $50,000 loan for the same), and knew that Mosaic charged an undisclosed dealer fee because Attyx had a separate agreement with Mosaic regarding the same.  Mosaic knew its undisclosed dealer fee and knew that the same was not properly disclosed to Plaintiff.

153.    At all times, Attyx and Mosaic acted with an intent to induce reliance because both Attyx and Mosaic made the above-referenced misrepresentations and omissions for the purpose of Plaintiff relying on them in purchasing a Solar System.

154.    Plaintiff justifiably relied on Attyx and Mosaic's misrepresentations and omissions because Plaintiff relied on Attyx's misrepresentations in agreeing to proceed with purchasing the Solar System and, but for Attyx's and Mosaic's misrepresentations and omissions, Plaintiff would not have purchased the Solar System.

155.    Plaintiff suffered damages as a direct and proximate result of Attyx and Mosaic's misrepresentations and omissions in that Plaintiff paid more for the Solar System than represented, Attyx charged Plaintiff $50,000 for roofing work that should have been free (and fraudulently obligated him to a loan with Service Finance), charged Plaintiff an undisclosed dealer fee, caused Plaintiff to incur larger monthly payments than promised, higher utility bills, among other damages.

156.    Defendants Attyx and Mosaic's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Classes' rights and well-being, and with the aim of enriching Defendants Attyx and Mosaic.  Defendants Attyx

and Mosaic's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, and targeted at lower income consumers, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

157.   Plaintiff is entitled to actual damages, punitive damages, rescission of the transaction to purchase a Solar System from Attyx, and rescission of the purported loan agreements with Mosaic and Service Finance.

158.   Lenders Mosaic, WebBank, Solar Servicing, and Service Finance are each liable as holders of Plaintiff's loans originated by Mosaic and Service Finance under the FTC's Holder Rule.  Mosaic, WebBank, and Service Finance are liable both directly and as holders.

## SECOND COUNT
### Negligent Misrepresentation
### (On behalf of Plaintiff and the Classes Against All Defendants)

159.   Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

160.   Plaintiff brings this count on behalf of himself and the members of the Classes.

161.   Plaintiff (and class members) had a privity-like relationship with Attyx because they purchased solar panels from Attyx which imposed a duty on Attyx to impart correct information on Plaintiff.

162.   Plaintiff and class members had a privity-like relationship with Mosaic and Service Finance because Mosaic and Service Finance purported to bind Plaintiff and class members to loans.

163.   Attyx provided incorrect information to Plaintiff and class members.

164.   Attyx made numerous material misrepresentations of fact to Plaintiff, including: (1) fraudulently representing to Plaintiff that Attyx would replace his roof for free as an incentive

for purchasing a Solar System from Attyx; (2) that Plaintiff would only pay $28,520 out-of-pocket for the Solar System; (3) that Plaintiff's utility bills would be greatly reduced or eliminated as a result of purchasing a Solar System from Attyx; and (4) that Plaintiff would only pay $167 per month for the Solar System. Each of these misrepresentations by Attyx were material because they induced Plaintiff to proceed with purchasing a Solar System from Attyx. Had Plaintiff known the truth, that the Solar System would cost significantly more than represented and that the roof replacement was not actually free (but rather cost $50,000), Plaintiff would not have agreed to purchase the Solar System.

165. Attyx fraudulently affixed Plaintiff's signature to its purported sales agreement and to the purported loan agreements with Mosaic and Service Finance.

166. Attyx also fraudulently concealed and suppressed material facts regarding the Solar System, including that it was signing Plaintiff up for two separate loans from Mosaic and Service Finance which Plaintiff did not agree to, which purported to bind him to loans totaling $100,300, a price which far exceeded the promised $28,520 out-of-pocket. Plaintiff believed the transaction was between him and Attyx. Attyx had a duty to disclose this information because Defendant Attyx had superior knowledge of the information regarding the true cost of the Solar System and the financing agreements which were not readily available to Plaintiff, and Attyx clearly knew Plaintiff was acting based on mistaken knowledge. At minimum, Attyx made a partial or ambiguous statement to Plaintiff regarding the cost of the Solar System the meaning of which would only be clear after a complete disclosure of the circumstances by Attyx. In short, Attyx had a duty to inform Plaintiff about the full nature of the transaction it sought to bind Plaintiff to. Had Plaintiff known the true terms of the transaction Attyx sought to bind him to, he would not have agreed to purchase the Solar System.

167. Attyx also fraudulently concealed and suppressed material facts regarding Mosaic's dealer fee, which was an undisclosed finance charge. Attyx had superior knowledge regarding Mosaic's dealer fee because it had an agreement with Mosaic regarding the same which Plaintiff was wholly unaware of and Attyx knew that the dealer fee was not disclosed to Plaintiff and therefore that Plaintiff was acting on mistaken knowledge. Had Plaintiff been aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the transaction.

168. Attyx also fraudulently concealed and suppressed material facts regarding the cost of the roofing work it promised would be free, namely that it sought to obligate Plaintiff to a $50,000 loan with Service Finance for the purportedly "free" work. Had Plaintiff known the roof replacement was not actually free and that Attyx sought to bind him to a $50,000 loan for the same, he would not have agreed to proceed with the transaction.

169. Mosaic provided incorrect information to Plaintiff and class members.

170. Mosaic also fraudulently concealed and suppressed material facts regarding its dealer fee, which was an undisclosed finance charge. Mosaic did not disclose the dealer fee to Plaintiff at any time despite knowing that the dealer fee was fraudulently added to the "Amount Financed" such that Plaintiff and class members had no notice of the same. Had Plaintiff been aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the Solar System transaction.

171. Plaintiff justifiably relied on Attyx and Mosaic's misrepresentations and omissions because Plaintiff relied on Attyx's misrepresentations in agreeing to proceed with purchasing the Solar System and, but for Attyx's and Mosaic's misrepresentations and omissions, Plaintiff would not have purchased the Solar System.

172. Plaintiff suffered damages as a direct and proximate result of Attyx and Mosaic's misrepresentations and omissions in that Plaintiff paid more for the Solar System than represented, Attyx charged Plaintiff $50,000 for roofing work that should have been free (and fraudulently obligated him to a loan with Service Finance), charged Plaintiff an undisclosed dealer fee, among other damages.

173. Plaintiff is entitled to actual damages, punitive damages, rescission of the transaction to purchase a Solar System from Attyx, and rescission of the purported loan agreements with Mosaic and Service Finance.

174. Lenders Mosaic, WebBank, Solar Servicing, and Service Finance are each liable as holders of Plaintiff's loans originated by Mosaic and Service Finance under the FTC's Holder Rule. Mosaic, WebBank, and Service Finance are liable both directly and as holders.

### THIRD COUNT
**Deceptive Acts Or Practices, New York Gen. Bus. Law § 349**
**(On behalf of Plaintiff and the New York Subclasses Against All Defendants)**

175. Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

176. Plaintiff brings this count on behalf of himself and the members of the New York Subclasses.

177. By the acts and conduct alleged herein, Defendant Attyx committed unfair or deceptive acts and practices by misrepresenting and concealing from Plaintiff and members of the New York Subclasses: (1) the true costs of its solar systems; (2) that customers would be entitled to free roof replacements incidental to agreeing to purchase a solar system; and (3) Mosaic's dealer fees.

178. Attyx made numerous material misrepresentations of fact to Plaintiff, including: (1) representing to Plaintiff that Attyx would replace his roof for free as an incentive for

purchasing a Solar System; (2) that Plaintiff would only pay $28,520 out-of-pocket for the Solar System; (3) that Plaintiff's utility bills would be greatly reduced or eliminated as a result of purchasing a Solar System from Attyx; and (4) that Plaintiff would only pay $167 per month for the Solar System. Each of these misrepresentations by Attyx were material because they induced Plaintiff to proceed with purchasing a Solar System from Attyx. Had Plaintiff known the truth, that the Solar System would cost significantly more than represented and that the roof replacement was not actually free (but rather costed $50,000), Plaintiff would not have agreed to purchase the Solar System.

179. Attyx also concealed and suppressed material facts regarding the Solar System, including that it was signing Plaintiff up for two separate loans from Mosaic and Service Finance which Plaintiff did not agree to, which purported to bind him to loans totaling $100,300. Plaintiff believed the transaction was between him and Attyx. Attyx had a duty to disclose this information because Defendant Attyx alone possessed knowledge of the information regarding the true cost of the Solar System and the financing agreements which could not be reasonably obtained by Plaintiff. At minimum, Attyx made a partial or ambiguous statement to Plaintiff regarding the Solar System the meaning of which would only be clear after a complete disclosure of the circumstances by Attyx. In short, Attyx had a duty to inform Plaintiff about the full nature of the transaction it sought to bind Plaintiff to. Had Plaintiff known the true terms of the transaction Attyx sought to bind him to, he would not have agreed to purchase the Solar System.

180. Attyx also concealed and suppressed material facts regarding Mosaic's dealer fee, which was an undisclosed finance charge. Attyx alone possessed knowledge of the information regarding Mosaic's dealer fee because it had an agreement with Mosaic regarding the same which Plaintiff was wholly unaware of and could not reasonably obtain. Had Plaintiff been

aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the transaction.

181.   Similarly, Mosaic also concealed and suppressed material facts regarding its dealer fee, which was an undisclosed finance charge.  Mosaic did not disclose the dealer fee to Plaintiff at any time despite knowing that the dealer fee was added to the "Amount Financed" such that Plaintiff and class members had no notice of the same.  Had Plaintiff been aware that he was being charged an excessive dealer fee, he would not have agreed to proceed with the transaction.

182.   Attyx also concealed and suppressed material facts regarding the cost of the roofing work it promised would be free, namely that it sought to obligate Plaintiff to a $50,000 loan with Service Finance for the purportedly "free" work.  Had Plaintiff known the roof replacement was not actually free and that Attyx sought to bind him to a $50,000 loan for the same, he would not have agreed to proceed with the transaction.

183.   Each of Attyx's and Mosaic's deceptive acts were directed at consumers, including lower-income consumers.

184.   The foregoing deceptive acts and omissions are misleading in a material way because they caused Plaintiff to purchase a Solar System he would not otherwise have purchased but for the deceptive acts and omissions, they caused Plaintiff to pay more for the Solar System than the terms presented to him, and they caused Plaintiff to be obligated to a solar loan and a home improvement loan he would not have otherwise agreed to and to pay an undisclosed dealer fee to Mosaic.

185.   On behalf of himself and other members of the New York Subclasses, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

41

186.    Lenders Mosaic, WebBank, Solar Servicing, and Service Finance are each liable as holders of Plaintiff's loans originated by Mosaic and Service Finance under the FTC's Holder Rule.  Mosaic, WebBank, and Service Finance are liable both directly and as holders.

**FOURTH COUNT**
**Violation of the Truth in Lending Act**
**(On behalf of Plaintiff and the Nationwide Lender Class and New York Lender Class)**

187.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

188.    Plaintiff brings this claim on behalf of himself and the members of the Nationwide Lender Class and New York Lender Class.

189.    The stated purpose of the TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

190.    The TILA mandates that lenders disclose certain costs of credit associated with the transaction prior to consummation of the transaction. 15 U.S.C. § 1631(a).  TILA requires creditors to disclose to borrowers "'[t]he finance charge[s]'" of consumer loans. 15 U.S.C. § 1638(a)(3).

191.    Disclosures mandated under the TILA include use of the "amount financed," "finance charge," "total of payments," and "annual percentage rate", as well as a "descriptive explanation" of each of these terms. 15 U.S.C. §1638(a)(2)–(5); Reg. Z, §1026.18(b), (d)–(e), (h).  TILA also requires creditors to disclose to borrowers the "'amount[s] financed,'" which include "the principal amount[s]" of the loans and not their "finance charge[s]," 15 U.S.C. § 1638(a)(2)(A), as well as the "annual percentage rate[s]" of loans, 15 U.S.C. § 1638(a)(4).

192.    Regulation Z, which was enacted pursuant to TILA, defines "finance charge" as follows: "The finance charge is the cost of consumer credit as a dollar amount. It includes any

charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction." 12 CFR § 1026.4(a).

193.    TILA requires that the mandatory disclosures set forth above "be made before the credit is extended" to consumers. 15 U.S.C. § 1638(b)(1).

194.    The TILA also requires the disclosure of "[t]he number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. §1638(a)(6).

195.    Further, the TILA requires delivery of two copies of the notice of the right to rescind which clearly and conspicuously disclose the date the rescission period ended. See § 125(a) of the Act, 15 U.S.C. § 1635(a), Regulation Z § 226.23(b), 12 C.F.R. § 226.23(b).

196.    The TILA mandates that these disclosures be written in a manner that is accurate, clear and conspicuous. See 15 U.S.C. §§ 1632(a), 1638(a)(2)–(5); Reg. Z, §1026.17(a).

197.    "The creditor shall make disclosures before consummation of the transaction." Reg. Z, §1026.17(b).

198.    Accurate disclosures are necessary for consumers to be able to make meaningful comparisons of credit alternatives. 15 U.S.C. § 1638.

199.    Defendants Mosaic and WebBank, through either their platform, their agents, or both, did not provide the mandatory disclosures in a conspicuous manner prior to the consummation of the fraudulent loan transactions and thus did not comply with the requirements of the TILA and Regulation Z.

200.    Defendants Mosaic and WebBank violated the TILA and Regulation Z with misleading disclosures including by providing an inaccurate calculation of the amount financed and by failing to provide an accurate itemization. As a result of Defendants Mosaic and WebBank's violations of the TILA, Plaintiff was unable to make a meaningful assessment or

43

comparison to alternatives of the amount which Defendant has since represented that Plaintiff is expected to pay.

201.    Mosaic's loan surcharges/dealer fees were required under TILA to be disclosed to Attyx's customers as finance charges but were instead concealed within the amounts financed (i.e. the cost of the solar system and the dealer fee were improperly lumped together as one number), resulting in incorrect statements of finance charges, amounts financed, and APRs.

202.    Mosaic's loan surcharges/dealer fees were finance charges because they were charged to consumers "as an incident to or a condition of the extension of credit" and were not charged to consumers in comparable cash transactions. 12 CFR § 1026.4(a).

203.    Truth-in-lending disclosures were required under TILA to be provided to Attyx's customers before credit was extended to them but were not so provided.

204.    As a result of these violations, Plaintiff and the TILA class are entitled to actual and statutory damages, cancellation or recission of any subject contracts, and reasonable attorneys' fees and costs. 15 U.S.C. § 1640.

205.    Lenders Mosaic, WebBank, Solar Servicing, and Service Finance are each liable as holders of Plaintiff's loans originated by Mosaic and Service Finance under the FTC's Holder Rule.  Mosaic, WebBank, and Service Finance are also directly liable.

## FIFTH COUNT
### Violation of New York's Uniform Commercial Code
### (On behalf of Plaintiff and the New York Subclasses Against Mosaic and WebBank)

206.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

207.    Plaintiff brings this claim on behalf of himself and the members of the New York Subclasses.

44

208.    New York's Uniform Commercial Code ("NY UCC") §9-509 provides that a party may only file a financing statement where the debtor authorizes a filing or has agreed to become bound by a security agreement.

209.    NY UCC § 9-510 provides that a filed financing statement is ineffective to perfect a security interest where the filing is not authorized.

210.    UCC § 9-203 requires a signed and authenticated security agreement for an enforceable security interest.

211.    Mosaic filed or caused to be filed an unauthorized financing statement with the City Register of the City of New York, in particular a UCC-1 Financing Statement filed in the real estate records associated with Plaintiff's residence (hereinafter the "UCC-1 Financing Statement").

212.    The UCC-1 Financing Statement Mosaic filed or caused to be filed alleges a secured purchase money security interest against Plaintiff in favor of Defendant Mosaic resulting from a lien and purchase money obligation.

213.    Plaintiff did not authorize the filing of the UCC-1 Financing Statement.

214.    Plaintiff did not agree to any security agreement permitting the UCC-1 Financing Statement.

215.    There is no signed and authenticated or otherwise authorized security agreement between Plaintiff and Mosaic/WebBank as required for an enforceable security interest.

216.    Mosaic/WebBank filed or caused filing of an unauthorized UCC-1 fixture filing which to date still appears on the New York City Automated City Register Information System (ACRIS) as a fixture lien associated with Plaintiff's residence.

217.    As a result of these violations, Plaintiff has been damaged and is entitled to actual and statutory damages pursuant to NY UCC § 9-625 as well as declaratory relief.

**SIXTH COUNT**
**Unjust Enrichment**
**(On behalf of Plaintiff and the Classes Against All Defendants)**

218.    Plaintiff incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

219.    Plaintiff brings this count on behalf of himself and the members of the Classes.

220.    Defendants Attyx, Young, and Payne were unjustly enriched by the sale of the Solar System to Plaintiff based on fraudulent terms.

221.    Mosaic was unjustly enriched by the receipt of the undisclosed dealer fee that was not disclosed to Plaintiff and by payments made by Plaintiff under the fraudulently procured loan regarding Plaintiff's Solar System.  WebBank, as the lender for which Mosaic served as the broker/designer, was similarly unjustly enriched.

222.    Service Finance was unjustly enriched by originating a fraudulent loan obligating Plaintiff to make payments for a roof replacement that Attyx promised would be free.  Service Finance partnered with Attyx knowing that it was originating loans for home improvement projects promised by Attyx to be free.  Service Finance is also unjustly enriched to the extent it has collected any payments from Plaintiff and class members on said loans.

223.    Each of the above-mentioned Defendants were enriched at Plaintiff's expense because Plaintiff has paid or is obligated to pay for the Solar System which was sold to him on false pretenses.

224.    It is against equity and good conscience for Defendants Attyx, Young, Payne, Mosaic, WebBank, and Service Finance to retain the funds because each participated in the fraudulent scheme to bind Plaintiff to a Solar System on false pretenses, as set forth herein.

225.    Plaintiff and members of the Classes are entitled to restitution or disgorgement of, or the imposition of a constructive trust upon, all profits, benefits, and other compensation obtained

46

by Defendants Attyx, Young, Payne, Mosaic, WebBank, and Service Finance through its deceptive, misleading, and improper conduct.  Plaintiff is also entitled to rescission of the fraudulently procured Attyx sales contract and the purported loan agreements with Mosaic, WebBank, and Service Finance.

226.    Lenders Mosaic, WebBank, Solar Servicing, and Service Finance are each liable as holders of Plaintiff's loans originated by Mosaic and Service Finance under the FTC's Holder Rule.  Mosaic, WebBank, and Service Finance are liable both directly and as holders.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the Classes, that the Court enter judgment in his favor and against Defendants as follows:

A.  An Order certifying each of the proposed Classes and appointing Plaintiff and his Counsel to represent the Classes;

B.  An Order declaring that Defendants are liable for each of the causes of action set forth herein;

C.  An Order of disgorgement of wrongfully obtained profits;

D.  An Order rescinding Plaintiff's and the Classes' purported sales contracts with Attyx and purported loan agreements with Mosaic, Service Finance, Solar Servicing, and/or WebBank;

E.  An award of compensatory, statutory, and punitive damages, in an amount to be determined;

F.  Declaratory judgment that any lien or UCC-1 financing statement claimed by Defendants against Plaintiff and members of the New York Subclasses is removed;

G.  Termination of any security interests relating to the transaction;

H. An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law;

I. Interest on all amounts awarded, as allowed by law; and

J. Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands, for himself and the Classes, a trial by jury of all issues so triable.

Dated: April 27, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Yitzchak Kopel*
        Yitzchak Kopel

Yitzchak Kopel
Andrew J. Obergfell
1330 Avenue of the Americas, Fl. 32
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: ykopel@bursor.com
        aobergfell@bursor.com

*Attorneys for Plaintiff*

48